UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TAMMY S. SHARP,

          Plaintiff,                  CIVIL ACTION NO. 12-14772

          v.                      DISTRICT JUDGE GEORGE CARAM STEEH

                              MAGISTRATE JUDGE MARK A. RANDON

COMMISSIONER OF
SOCIAL SECURITY,

          Defendant.

_____/

## REPORT AND RECOMMENDATION
## ON CROSS MOTIONS FOR SUMMARY JUDGMENT (DKT. NOS. 18, 22)

Plaintiff Tammy S. Sharp challenges the Commissioner of Social Security's ("the Commissioner") final denial of her benefits application. Cross motions for summary judgment are pending (Dkt. Nos. 18, 22); Plaintiff also filed a reply (Dkt. No. 23). Judge George Caram Steeh referred the motions to this Magistrate Judge for a Report and Recommendation (Dkt. No. 4).

### I.     RECOMMENDATION

Because substantial evidence supports the Administrative Law Judge's ("ALJ") credibility determination and Plaintiff's remaining Step Five argument lacks merit, this Magistrate Judge **RECOMMENDS** that Plaintiff's motion for summary judgment be **DENIED**, Defendant's motion for summary judgment be **GRANTED**, and the Commissioner's findings be **AFFIRMED**.

-1-

II.     DISCUSSION

    *A. Framework for Disability Determinations*

Under the Social Security Act (the "Act"), Disability Insurance Benefits and Supplemental Security Income are available only for those who have a "disability." *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). The Act defines "disability," in relevant part, as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment, which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).

The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

Step Two: If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.

Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

*See* 20 C.F.R. §§ 404.1520, 416.920; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "The burden of proof is on the claimant throughout the first four steps . . . . If the analysis reaches the fifth step without a finding that the claimant is disabled, the burden transfers to the [Commissioner]." *Preslar v. Sec'y of HHS*, 14 F.3d 1107, 1110 (6th Cir. 1994).

### B.  Standard of Review

This Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited such that the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal quotation marks omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses") (internal quotation marks omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted); *see also Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted) (explaining that if the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion"); *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc) (noting that the substantial evidence standard "presupposes . . . a

zone of choice within which the decisionmakers can go either way, without interference by the courts" (internal quotation marks omitted)).

When reviewing the Commissioner's factual findings for substantial evidence, this Court is limited to an examination of the record and must consider that record as a whole. *See Bass v. McMahon*, 499 F.3d 506, 512-13 (6th Cir. 2007); *Wyatt v. Sec'y of HHS*, 974 F.2d 680, 683 (6th Cir. 1992). The Court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston*, 245 F.3d at 535. There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record. *See Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party") (internal quotation marks omitted). Further, this Court does "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass*, 499 F.3d at 509; *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant").

### III.   REPORT

#### A.   *Administrative Proceedings*

Plaintiff applied for disability insurance benefits and supplemental security income on July 26, 2010, alleging a disability onset date of August 31, 2007; the Commissioner denied the application (Tr. 17). Plaintiff appeared with counsel for a hearing before ALJ Donald G. D'Amato, who considered the case *de novo* (*Id.*). In a written decision, ALJ D'Amato found Plaintiff was not disabled (Tr. 17-27). Plaintiff requested an Appeals Council review (Tr. 8-13). On August 23, 2012, the ALJ's findings became the Commissioner's final administrative decision when the Appeals Council declined further review (Tr. 1-5).

-4-

### B. ALJ Findings

Plaintiff has a high school education and past relevant work as a retail sales associate, waitress, and cleaner (Tr. 26). The ALJ applied the five-step disability analysis to Plaintiff's claim and found at step one that she had not engaged in substantial gainful activity since her alleged onset date (Tr. 19).

At step two, the ALJ found that Plaintiff had the following "severe" impairments: left-sided numbness and intermittent episodes of dizziness secondary to possible multiple sclerosis,[1] rule out peripheral vestibular dysfunction[2] as cause of dizziness; morbid obesity; panic disorder with agoraphobia; major depressive disorder; history of headaches; degenerative joint disease/arthritis of the left knee;[3] lumbago;[4] polyarthralgias[5] possibly secondary to fibromyalgia[6]

---

[1] "Multiple sclerosis is an autoimmune disease that affects the brain and spinal cord (central nervous system). . . . MS is caused by damage to the myelin sheath, the protective covering that surrounds nerve cells. When this nerve covering is damaged, nerve signals slow down or stop." *See* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001747/ (last accessed December 28, 2013).

[2] "Dizziness, vertigo and disequilibrium are . . . all symptoms that can result from a peripheral vestibular disorder (a dysfunction of the balance organs of the inner ear) or central vestibular disorder (a dysfunction of one or more parts of the central nervous system that help process balance and spatial information)." *See* http://vestibular.org/node/2 (last accessed December 29, 2013).

[3] "Osteoarthritis [, also known as degenerative joint disease,] is the most common joint disorder, which is due to aging and wear and tear on a joint." *See* http://www.nlm.nih.gov/medlineplus/ency/article/000423.htm (last visited December 23, 2013).

[4] "Lumbago is the general term referring to low back pain, and the two terms are often used interchangeably." *See* http://www.spine-health.com/conditions/lower-back-pain/understanding-low-back-pain-lumbago (last accessed December 29, 2013).

[5] "Arthralgia simply means pain in a joint. This can come from many reasons including: [b]ruising the joint which causes inflammation (soreness) in the joint[; f]rom the wear and tear on the joints which occur as we grow older (osteoarthritis)[; o]verusing the joint[; v]arious forms of arthritis[; and, i]nfections of the joint" (Tr. 222).

or rheumatoid arthritis;[7] insomnia with possible obstructive sleep apnea;[8] degenerative changes

of the lumbar spine consistent with grade 1 anterolisthesis[9] of L5 and S1 with probable

spondylosis[10] of the L5 vertebral level; and mild spinal canal stenosis[11] at C5-C6 (Tr. 19).

---

[6] "Fibromyalgia is a common syndrome in which a person has long-term, body-wide pain and tenderness in the joints, muscles, tendons, and other soft tissues. Fibromyalgia has also been linked to fatigue, sleep problems, headaches, depression, and anxiety." *See* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001463/ (last accessed December 29, 2013).

[7] Rheumatoid arthritis is "a chronic systemic disease primarily of the joints, usually polyarticular, marked by inflammatory changes in the synovial membranes and articular structures and by muscle atrophy and rarefaction of the bones. In late stages deformity and ankylosis develop." *Dorland's Illustrated Medical Dictionary*, 152-59 (31st Ed. 2007).

[8] "Sleep apnea [] is a common disorder in which you have one or more pauses in breathing or shallow breaths while you sleep. . . When your breathing pauses or becomes shallow, you'll often move out of deep sleep and into light sleep. As a result, the quality of your sleep is poor, which makes you tired during the day. Sleep apnea is a leading cause of excessive daytime sleepiness." *See* http://www.nhlbi.nih.gov/health/health-topics/topics/sleepapnea/ (last accessed December 29, 2013).

[9] Anterolisthesis "is basically another term for spondylolisthesis. Anterolisthesis is a spine condition in which the upper vertebral body, the drum-shaped area in front of each vertebrae, slips forward onto the vertebra below. . . .The symptoms of anterolisthesis can vary greatly depending if and how much the slippage pinches the nerve roots and what area is affected." *See* http://www.spine-health.com/glossary/anterolisthesis (last accessed December 29, 2013).

[10] "Lumbar spondylosis . . . describes bony overgrowths (osteophytes), predominantly those at the anterior, lateral, and, less commonly, posterior aspects of the superior and inferior margins of vertebral centra (bodies). This dynamic process increases with, and is perhaps an inevitable concomitant, of age." *See* http://emedicine.medscape.com/article/249036-overview (last accessed December 28, 2013).

[11] "Spinal stenosis is a narrowing of the open spaces within your spine, which can put pressure on your spinal cord and the nerves that travel through the spine. Spinal stenosis occurs most often in the neck and lower back." *See* http://www.mayoclinic.com/health/spinal-stenosis/DS00515 (last accessed December 29, 2013).

At step three, the ALJ found no evidence that Plaintiff's impairments met or medically equaled one of the listings in the regulations (Tr. 20-21).

Between steps three and four, the ALJ found Plaintiff had the Residual Functional Capacity ("RFC") to:

> perform sedentary work[12] . . . except that she requires work which is non-production line oriented, simple, and unskilled, can occasionally work in close proximity to coworkers and supervisors (meaning that the claimant can occasionally function as a member of a team); can occasionally have direct contact with the public, in a low stress environment defined as having only occasional changes in the work setting; can lift and/or carry [five] pounds frequently and 10 pounds occasionally; can stand and/or walk for a total of [two] hours in an [eight] hour workday, but can do so for only 15 minutes at one time; occasionally requires a cane to ambulate; can sit for a total of [six] hours in an [eight] hour workday, but can do so for only 15 minutes at a time; can perform pushing, and pulling motions with the right upper and right lower extremities within the aforementioned weight restrictions, but can do so only occasionally with the left upper and left lower extremities, no overhead reaching with the left upper extremity; can perform activities requiring bilateral manual dexterity for both gross and fine manipulation with handling and reaching for 2/3 of an [eight] hour workday; needs to be restricted to a relatively clean work environment, meaning stable temperatures, humidity, and good ventilation that allows [Plaintiff] to avoid concentrated exposure to dusts, fumes, gases, odors, and other pulmonary irritants; can perform each of the following postural activities occasionally: climbing stairs with handrails, balancing, stooping, and crouching, but [] needs to avoid kneeling, crawling, and climbing ladders, scaffolds, ropes.

---

[12] Sedentary work involves:

lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. § 404.1567(a).

 (Tr. 21-22).

At step four, the ALJ found that Plaintiff could not perform any of her past relevant work (Tr. 26).

At step five, the ALJ found Plaintiff was not disabled, because she could perform a significant number of jobs in the national economy (Tr. 27).

### C.  Administrative Record

#### 1.        Plaintiff's Hearing Testimony and Statements[13]

Plaintiff worked approximately ten years in maintenance, but most of her life as a waitress (Tr. 41). She became disabled on August 31, 2007, when her ability to walk began to decline (Tr. 35-36). She was "pretty sick" a few days of that month: she spent them lying in bed, depressed and unable to walk because of her left knee and foot (*Id.*). At the time, she was waitressing (Tr. 36). Her psychiatrist recommended that she slow down with her work (Tr. 35). Around March of 2011, she returned to work, but she stopped after approximately one week because she felt unable to continue both physically and mentally (Tr. 37-38).

Plaintiff's whole body hurts (Tr. 45). She may have fibromyalgia or multiple sclerosis – which her sister has – but evaluations have not been completed; her insurance company will not cover certain tests (Tr. 36-37). Plaintiff also has a painful "big ball" on the back of her neck that has yet to be diagnosed; severe headaches daily; tremors primarily on her left side ten or twelve times a day; and, problems in her left knee, hip, and foot (she has no strength to walk on it) (Tr. 37, 42-44).

---

[13] Plaintiff's testimony before the ALJ reflects her subjective view of her medical condition, abilities, and limitations; it is not a factual finding of the ALJ or this Magistrate Judge.

-8-

Plaintiff can sit for short periods of time before she feels tremors and severe pain; stand in place for five to ten minutes at a time, while holding on to something; walk no more than one block, very slowly; and, lift approximately four pounds (Tr. 38-39). She does not really use the stairs in her home; she is afraid she will fall (Tr. 39). Plaintiff has no strength in her upper body or left side; uses a cane to ambulate 90 percent of the time; has trouble holding on to things on her left side; falls often – approximately once a week – even when using her cane; sleeps four to six hours a night; takes four to five naps during the day, approximately 15 to 20 minutes each; and, elevates her left leg every day because of swelling (Tr. 38-39, 42-43). To alleviate her symptoms, she takes her medications and lies down; she spends most of the day in bed (Tr. 42).

Plaintiff takes Vicodin and Naprosyn for pain, Lyrica for fibromyalgia, Buspar,[14] Xanax, a water pill, and a diet pill; the side effects include drowsiness and depression (Tr. 37, 39, 43-44). Without medication, her pain is usually a ten out of ten; such pain has caused her to visit the emergency room many times (Tr. 39). With medication, her pain is a six (*Id.*).

Plaintiff also has depression, anxiety, insomnia, and panic disorder with agoraphobia (Tr. 37). She sometimes has problems being in crowds, because she gets very nervous and has panic attacks (Tr. 40, 44). Medication has helped her panic disorder: whereas she used to have panic attacks two or three times a day, she now only experiences them two to three times a month (*Id.*). As for her other mental health problems, there are times every month where she shuts herself in in her room, getting up only when she must use the bathroom (Tr. 40). She is not in therapy, in large part because her insurance is very bad (Tr. 40-41).

---

[14] "[Buspar] is used to treat certain anxiety disorders or to relieve the symptoms of anxiety. However, [it] usually is not used for anxiety or tension caused by the stress of everyday life." *See* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0009364/?report=details (last accessed December 26, 2013).

Plaintiff lives by herself (Tr. 40). On a typical day, she does not do very much (*Id.*). She is unable to shop and does not do chores very much; her daughter and friends come over to help her with almost everything, including her laundry (Tr. 39-40, 44). She sometimes needs help getting out of bed to use the bathroom; bathing or dressing herself; and, getting out of the shower (Tr. 40, 44).

### 2. Relevant Medical Evidence

On May 2, 2010, Plaintiff presented to the emergency room; she was experiencing pain in her back and left leg after falling (Tr. 230). She had been able to work, and stated that walking had not been too painful (Tr. 232). An X-ray of her left knee revealed advanced degenerative changes with tricompartmental joint space disease and extensive periarticular hypertrophic spurs,[15] and no evidence of overt fracture, lystic or blastic process, or knee joint effusion (Tr. 235-36). An X-ray of her lumbar spine revealed grade 1 anterior listhesis[16] of L5 on S1 with probable spondylolysis[17] of L5; bilateral facet arthropathy[18] at L4-5 and L5-S1; preserved disc

---

[15] "Many patients are told that they have bone spurs in their back or neck, with the implication that the bone spurs are the cause of their back pain. However, bone spurs in and of themselves are simply an indication that there is degeneration of the spine; the presence of bone spurs does not necessarily mean that they are the actual cause of the patient's back pain." *See* http://www.spine-health.com/conditions/arthritis/bone-spurs-osteophytes-and-back-pain (last accessed December 28, 2013).

[16] *See supra* n. 9.

[17] "Spondylolysis is a condition in which the there is a defect in a portion of the spine called the *pars interarticularis* (a small segment of bone joining the facet joints in the back of the spine). With the condition of spondylolisthesis, the pars interarticularis defect can be on one side of the spine only (unilateral) or both sides (bilateral). The most common level it is found is at L5-S1, although spondylolisthesis can occur at L4-5 and rarely at a higher level. Spondylolysis is the most common cause of *isthmic spondylolisthesis*, in which one vertebral body is slipped forward over another. . . . Cases of either neurological deficits or paralysis are exceedingly rare, and for the most part it is not a dangerous condition. The most common symptom is back and/or

spaces; and, grossly unremarkable paravertebral soft tissues (Tr. 237). Range of motion, strength, and motor tone were normal (Tr. 232).

On July 23, 2010, Plaintiff presented to the emergency room complaining of diffuse pain; she was diagnosed with non-specific paresthesias[19] and acute arthralgia,[20] and given documentation on joint pain and a script for Prednisone, an anti-inflammatory (Tr. 221-27).

On July 26, 2010, Plaintiff reported that she was still falling down; felt pain scattered throughout her body; had severe headaches; and, was experiencing neurological symptoms, including numbness on the right side of her face (Tr. 291).

On August 3, 2010, an MRI of Plaintiff's brain revealed findings that in the correct clinic setting can suggest the diagnosis of multiple sclerosis (Tr. 287).

On August 5, 2010, Plaintiff presented to Bassam Maaz, M.D. for a neurological consultation (Tr. 276). She reported joint pain for weeks; pain throughout her body for a long time; episodes of dizziness for three months; left-sided numbness intermittently for six months;

---

leg pain that limits a patient's activity level." *See* http://www.spine-health.com/conditions/spondylolisthesis/spondylolysis-and-spondylolisthesis (last accessed December 29, 2013).

[18] "Facet joint arthropathy refers to a degenerative disease that affects the joints of the spine and the disintegration of cartilage on those joints." *See* http://www.laserspineinstitute.com/back_problems/facet_disease/articles/facet_joint_arthropathy/ (last accessed December 29, 2013).

[19] "Paresthesia refers to a burning or prickling sensation that is usually felt in the hands, arms, legs, or feet, but can also occur in other parts of the body. The sensation, which happens without warning, is usually painless and described as tingling or numbness, skin crawling, or itching. . . . Chronic paresthesia is often a symptom of an underlying neurological disease or traumatic nerve damage. Paresthesia can be caused by disorders affecting the central nervous system, such as . . . multiple sclerosis[;] . . . [a] tumor or vascular lesion pressed up against the brain or spinal cord can also cause paresthesia." *See* http://www.ninds.nih.gov/disorders/paresthesia/paresthesia.htm (last accessed December 29, 2013).

[20] *See supra* n. 5.

and knee pain for more than 20 years (*Id*.). Evaluation revealed normal finger-to-nose and heel-to-shin tests, gait, and tandem walk (Tr. 314). Dr. Maaz's clinical impression included: intermittent episodes of dizziness and left side numbness, rule out multiple sclerosis and peripheral vestibular dysfunction; joint pain, rule out arthralgia; rule out fibromyalgia; major depression disorder; and, rule out obstructive sleep apnea (*Id*.).

On August 13, 2010, Plaintiff reported continued pain throughout her body (Tr. 321). An August 23 neuropathy study revealed normal findings (Tr. 285-86).

On October 18, 2010, Leonidas Rojas, M.D., conducted a consultative examination (Tr. 294-97). Plaintiff exhibited no difficulty standing up from a chair or getting on and off the examining table; a Romberg test[21] was negative (Tr. 295). He found mild tenderness on Plaintiff's left knee, without swelling but with restriction on flexion to 120 degrees; bilaterally sluggish tendon reflexes; and, mildly diminished pinprick and vibratory sensations on her left lower limb with minimal weakness (Tr. 295). She walked with mild limping on the left side, but without an assistive device; was unable to walk tandem, on her heels or toes; and, was unable to squat over her left knee (*Id*.). He diagnosed degenerative disease of the left knee and lumbar spine; mild, left sided lumbar radiculopathy; severe obesity; possible MS; chronic depression, anxiety; and, polyarthralgias, probable fibromyalgia syndrome (*Id*.). He opined that Plaintiff was limited in her ability to stand, bend, stoop, carry, push, pull, and button clothes; she could not squat; and, light and sedentary work-related activities were within her capabilities (Tr. 296, 299).

---

[21] "The Romberg Test is a neurological test which detects poor balance and defects in proprioception.  The test involves standing with your feet together and closing your eyes.  The doctor will observe how you are able to maintain your balance and an upright posture [,and] . . . may [] push you slightly to see whether you are able to compensate and maintain an upright posture." *See* http://www.healthcentral.com/multiple-sclerosis/c/19065/130283/signs/ (last accessed December 29, 2013).

On November 8, 2010, Plaintiff presented to Jehan Barbat, M.D., with left hip pain (Tr. 347). He found a small cystic area in the head of the right humeral femur; no evidence of avascular neurosis, joint effusion, or acetabular lesion; and, normal surrounding muscles (*Id.*).

On December 22, 2010, in light of Plaintiff's suspected multiple sclerosis, an MRI was taken of Plaintiff's cervical and thoracic spine (Tr. 344). It revealed mild spinal canal stenosis at C5-C6, secondary to a disc spur, and no abnormal cervical or thoracic spinal cord signal (*Id.*).

On January 10, 2011, Plaintiff presented to the emergency room complaining of left knee pain and swelling: her neurologist, Dr. Maaz, had told her to go to the ER for a referral to a rheumatologist (Tr. 334-36). An X-ray of her left knee revealed degeneration without evidence of fracture or dislocation; treatment notes indicate that her swelling was of unknown etiology (Tr. 337-40). Plaintiff refused an assistive device and pain medication, which she had at home; she was discharged and given referrals for orthopedics and rheumatology (Tr. 337, 343).

On January 18, 2011, Plaintiff presented to family physician J.M. Pierre, M.D.; Dr. Pierre told her to see an orthopedic surgeon because she was falling when walking (Tr. 362).

On January 26, 2011, Plaintiff presented to Elie Khoury, M.D., an orthopedics physician, complaining of persistent knee pain that has worsened in the last year; she also reported that she was being evaluated to rule out a mass or rheumatoid arthritis (Tr. 353). Examination revealed some pain on flexion and extension of the left knee and some weakness in the quadriceps; an X-ray revealed no fracture, dislocation, or bony destruction; and, there were degenerative changes at the patellofemoral joint compartment (Tr. 353-54). Dr. Khoury opined that Plaintiff had either rheumatoid or degenerative arthritis and would likely require knee replacement surgery eventually; he gave Plaintiff shots for pain and advised her to return once evaluation for rheumatoid arthritis was complete (Tr. 353).

-13-

On March 10, 2011, Plaintiff presented to the emergency room with left knee and foot pain: she had fallen when her left knee gave out (Tr. 323-24). She denied dizziness, neck or back pain, or difficulty ambulating (*Id*.) Examination revealed no deformity or effusion; normal range of motion; intact neurovasculature; and, tenderness over her left knee (Tr. 325). X-rays of her left ankle, foot, and knee were negative; she was given crutches and advised to see an orthopedic specialist (Tr. 325-26).

On March 16, 2011, Joel Shavell, D.O., a rheumatology specialist, wrote to Dr. Pierre with the results of his examination (Tr. 351). Plaintiff had reported pain throughout her body that had exacerbated over the last year, but that she has had for a long time; she had no swelling of joints, but some muscle weakness on her left side (*Id*.). She could passively force her left knee to bend, and could flex it about 55 degrees; there was no swelling or redness; and, she had normal hips (Tr. 351). Dr. Shavell assessed obesity, degenerative arthritis of the left knee, and fibrositis-depression;[22] he opined that "the biggest issue with this patient is depression[;] she does have a hard time getting a good result with the knee. It will be temporary, and then you are going to have a problem because this patient is going to get less and less mobile despite the surgery. She has to be treated medically with significant psychiatric help" (Tr. 351).

On March 22, 2011, Dr. Pierre wrote a letter stating that Plaintiff had significant muscular impairment, a neurological disorder that interferes with her strength and coordination, and was permanently disabled and in need of transportation (Tr. 359).

_____

[22] "Inflammatory hyperplasia of white fibrous connective tissue, especially surrounding muscles, causing pain and stiffness." *See* http://medical-dictionary.thefreedictionary.com/fibrositis (last accessed December 29, 2013).

On March 23, 2011, Plaintiff reported pain in her foot (Tr. 350). Examination revealed tenderness over the fifth metatarsal (*Id.*) An X-ray of her left foot was negative for fracture, dislocation, or bony destruction; it showed a prominent calcaneal spur at the attachment of the plantar aponeurosis, a smaller spur at the attachment of the Achilles tendon, and a navicular spur (Tr. 349-50). Plaintiff was doing well and able to walk (*Id.*).

On March 31, 2011, Dr. Pierre again wrote a letter opining that Plaintiff was "disabled and [] needs transportation due to her medical condition" (Tr. 358).

On June 7, 2011, Dr. Pierre completed a physical residual functional capacity questionnaire (Tr. 379-82). He opined that Plaintiff could walk one block, sit for two hours, and stand for 30 minutes at a time and two hours total in an eight hour workday; required an at will sit to stand option, unscheduled breaks often for 30 minutes at a time, and – with prolonged sitting – an option to elevate her legs at waist level for four to six hours total (*Id.*). Plaintiff did not require an assistive device (*Id.*). She could occasionally lift less than ten pounds and rarely lift ten; occasionally look down, turn her head, look up, or hold her head in a static position; rarely twist and climb stairs; never stoop, crouch/squat, or climb ladders; and, would typically be absent from work more than four days per month (Tr. 382).

### D. Plaintiff's Claim of Error

#### 1.    Plaintiff's Credibility

Plaintiff argues that the ALJ erred in his credibility determination, because he did not properly evaluate her subjective complaints of disabling back and left knee pain, and pain from a neurological and/or muscle disorder. This Magistrate Judge disagrees.

The Sixth Circuit has recently instructed ALJs on how to assess a claimant's credibility:

-15-

> Credibility determinations regarding the applicant's subjective complaints of pain rest
> with the ALJ and are afforded great weight and deference as long as they are supported
> by substantial evidence. In assessing an individual's credibility, the ALJ must [first]
> determine whether a claimant has a medically determinable physical or mental
> impairment that can reasonably be expected to produce the symptoms alleged . . . . Next,
> the ALJ must evaluate the intensity, persistence, and functional limitations of the
> symptoms by considering objective medical evidence, as well as: (1) daily activities; (2)
> the location, duration, frequency, and intensity of pain or other symptoms; (3)
> precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects
> of any medication taken to alleviate pain or other symptoms; (5) treatment, other than
> medication, received for relief of pain or other symptoms; (6) any measures used to
> relieve pain or other symptoms; and (7) other factors concerning functional limitations
> and restrictions.

*Johnson v. Comm'r of Soc. Sec.*, __F. App'x __, 2013 WL 5613535, at *8 (6th Cir. Oct.15,

2013) (internal citations and quotations omitted). The ALJ is not required to address every

factor; he need only identify specific reasons for his credibility determination – supported by

evidence in the record – and clearly state the weight he gave to Plaintiff's statements and the

reasons for that weight. *Potter v. Colvin*, No. 3:12–CV–202, 2013 WL 4857731, at *13

(E.D.Tenn. Sept.11, 2013) (citing SSR 96–7p, 1996 WL 374186, at *2 (1996); *Tell v. Comm'r of

Soc. Sec.*, No. 11–15071, 2012 WL 3679138, at *11 (E.D.Mich. July 13, 2012)). Furthermore,

"[c]redibility determinations concerning a claimant's subjective complaints are peculiarly within

the province of the ALJ." *Strevy v. Comm'r of Soc. Sec.*, No. 1:12–cv–634, 2013 WL 54472803,

at *8 (W.D.Mich. Sept. 30, 2013) (citing *Gooch v. Sec'y of HHS*, 833 F.2d 589, 592 (6th

Cir.1987)). This Magistrate Judge finds the ALJ provided sufficient reasons for rejecting

Plaintiff's claims of disabling symptoms.

The ALJ first found that Plaintiff had medically determinable impairments that could

reasonably be expected to cause her alleged symptoms (Tr. 22). However, in his evaluation of

Plaintiff's subjective complaints, the ALJ did not find her statements concerning the intensity, persistence, and limiting effects of her symptoms fully credible (*Id.*).

As an initial matter, Plaintiff's argument consists merely of pointing to evidence that she believes could support a finding of disability, including her subjective complaints of pain. But the question is not whether substantial evidence supports a finding of disability, but whether there is substantial evidence to support the ALJ's decision. The Court cannot reweigh the evidence and substitute its own judgment for that of the ALJ. *See Brainard v. Sec 'y of Health and Human Servs.*, 889 F.2d 679, 681 (6th Cir.1989) (internal citation omitted).

As to her knee, Plaintiff points to regularly documented pain and swelling in her left knee, a July 2010 emergency room visit for joint pain, and X-rays in May of 2010 and January of 2011 that revealed degenerative changes (Dkt. No. 18 at p. 11 (CM/ECF), citing Tr. 230-35, 317, 335-36, 340, 353, 373). The ALJ addressed the record evidence, finding it to reflect degenerative joint disease and spurs of the left knee (Tr. 23).

There is no question that Plaintiff suffers degenerative disease of the left knee. But, "[t]he mere diagnosis of arthritis . . . says nothing about the severity of the condition." *Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988). Accordingly, the ALJ went on to discuss the other evidence of record pertinent to the severity and persistence of Plaintiff's symptoms. For example, he noted that Plaintiff reported knee pain that began getting worse in 2007 – her alleged onset date – but also claimed it had been present for more than 20 years. Meanwhile, the first medical evidence of record is dated May of 2010, when Plaintiff suffered knee and back pain after having slipped and fallen while cooking; she was able to work the next day (Tr. 23, 230-236). The ALJ also took note that, during Plaintiff's consultative exam, she walked with a limp on her left side, but did not require an assistive device; and, despite mild tenderness in her left knee, she had no difficulty

-17-

rising from her chair or getting on and off the exam table (Tr. 23, 295). The ALJ also noted that Plaintiff rated her pain – the location of which she did not specify – as a six out of ten with medication (Tr. 23. 39).

As to Plaintiff's back pain, she points to MRI's in May and December of 2010, and an emergency visit in July of 2010 where she complained of pain in her cervical spine (Dkt. No. 18 at p. 11 (CM/ECF), citing Tr. 232, 354). Again, the ALJ discussed the objective medical evidence: the May objective studies – taken only after she suffered a fall – showed spondylolisthesis L5 on S1 and probable spondylolysis of L5; and her July visit – which was for diffuse pain throughout her body – resulted in diagnoses of joint pain, and a script for prednisone (Tr. 23, 221-27). The ALJ did not expressly mention the findings of Plaintiff's December 2010 MRI, but any error is harmless: the findings were largely normal, aside from mild spinal canal stenosis at C5-C6 (Tr. 344). And, the ALJ's overall evaluation of the medical evidence is not inconsistent with the evidence of record: he concluded that, "[w]ith the exception of her knee, the majority of clinical and examination findings are normal or within normal limits" (Tr. 25).

The ALJ also discussed the opinions of record and found the overall weight of the opinions inconsistent with Plaintiff's allegations. For example, although Plaintiff testified that she could only sit for short periods of time before she felt severe pain and tremors, the opinion evidence of record stands in stark contrast with Plaintiff's testimony. Dr. Pierre – to whom the ALJ afforded little weight – opined that she could sit for two hours (Tr. 24, 279-82). Meanwhile, the ALJ gave significant weight to the opinion of consultative examiner Dr. Lojas, who opined Plaintiff was capable of performing light and sedentary work, unable to squat, and limited in her ability to stand, bend, stoop, carry, push, pull, and button clothes (Tr. 25, 296, 299). Dr. Lojas did not limit her ability to sit (Tr. 299). The ALJ's RFC reflects these postural limitations,

-18-

limiting Plaintiff to the occasional climbing of stairs with handrails, balancing, stooping, and crouching, but no kneeling, crawling, or climbing of ladders, scaffolds, and ropes (Tr. 21-22).

As to her "neurological and/or muscle disorder (most likely Multiple Sclerosis)," Plaintiff points to an emergency room visit where she complained of diffuse pain, and treatment notes which reflect similar complaints (Dkt. No. 18 at pp. 11-12 (CM/ECF), citing Tr. 226-27, 321). The ALJ acknowledged a possible diagnosis of multiple sclerosis and noted this evidence – which is simply a recitation of Plaintiff's subjective complaints – but reasonably found it insufficient: Plaintiff testified that testing for rheumatoid arthritis or multiple sclerosis had not been completed, and Dr. Pierre provided no specificity related to her diagnosis, supporting testing, or treatment notes for these diagnoses (Tr. 24). The ALJ elaborated on the opinions of Dr. Pierre, affording them little weight (Tr. 24). With respect to the June 2011 functional capacity questionnaire, the ALJ noted:

> There is no evidence supporting such a deterioration of the claimant's conditions from the prior mostly favorable October 2010 and March 2011 examinations by other physicians, such that she is precluded from performing all work, nor supporting that she would need to elevate her legs 4-6 hours per day or have a level of absences exceeding four per month. Further, although Dr. Shavell mentioned the claimant's psychological condition was the primary concern as of March 2011, as discussed below, mental examiners opine that even the claimant's mental impairments do not preclude her from all work

(Tr. 24).

Notably, Dr. Shavell is the only rheumatologist to have evaluated Plaintiff, and Plaintiff does not contest the ALJ's findings as to her mental limitations: he gave the mental examiners' opinions significant weight (Tr. 25). Additionally, although Plaintiff testified that she needed to elevate her leg several times a day, there is no evidence that any physician instructed her to do so. Furthermore, Dr. Pierre's March 31 letters are vague and appear to be written as professional verification of Plaintiff's eligibility for public transportation: they appear in the record alongside

-19-

a form Dr. Pierre completed for a reduced fare program for individuals with disabilities, where Dr. Pierre indicated – with nearly duplicative language – that Plaintiff had a "[s]ignificant muscular-skeletal impairment" and a "[n]eurological disorder that interferes with coordination, strength or endurance" (Tr. 358-59, 377).

Plaintiff also suggests that the ALJ erred in his credibility finding, because he improperly used her reported daily activities to undermine her credibility. The ALJ briefly acknowledged disparity, stating "claimant testified her daughter helps her with everything; however, she recently reported doing chores, cooking, attending church occasionally, and reading in her free time, while receiving some assistance from a friend" (Tr. 22, Tr. 303). His statement is an accurate assessment of Plaintiff's October 18, 2010 consultative exam, and merely reflects that he considered Plaintiff's daily activities in his assessment of her credibility, as required by the regulations. *See Johnson*, 2013 WL 5613535, at *8. Moreover, this is not the sole or dispositive factor considered in the ALJ's credibility determination.

Ultimately, the ALJ properly relied on a reasonable assessment of the record over Plaintiff's personal testimony. *See White v. Comm'r of Soc. Sec.*, 572 F.3d 272 (2009). As such, this Magistrate Judge finds substantial evidence supports the ALJ's evaluation of Plaintiff's credibility. His decision should not be disturbed on appeal.

## 2.        Step Five Determination

Plaintiff argues that the ALJ's RFC was erroneous because he discounted Plaintiff's testimony that she is unable to perform "postural maneuvers" (Dkt. No. 18 at p. 14 (CM/ECF)).[23]

---

[23] Plaintiff also quotes regulations that relate to the assessment of mental limitations (Dkt. No. 18 at p. 13 (CM/ECF)). But, she substantiates no further; as such, any purported argument related to the ALJ's assessment of Plaintiff's mental limitations is waived. *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir.1997) ("[I]ssues adverted to in a perfunctory manner,

But, Plaintiff did not expressly testify to such limitations at the hearing. Plaintiff argues that the ALJ's RFC was erroneous because Plaintiff cannot stoop *occasionally*: according to consultative examiner Lojas, whose opinion was afforded significant weight, she can *never* stoop (Dkt. No. 18 at p. 14 (CM/ECF)). Plaintiff, however, is mistaken: Dr. Lojas stated that Plaintiff was *limited* in her ability to stoop, before he concluded that she was able to perform light or sedentary work (Tr. 299). Dr. Pierre did opine that Plaintiff could not stoop, but the ALJ afforded his opinion little weight and Plaintiff does not advance an argument pertaining to the ALJ's weight of opinion evidence (Tr. 24, 382). Plaintiff also suggests that the ALJ erred by failing to include an inability to squat in his RFC, which was also part of Dr. Lojas' opinion; but, the ALJ's RFC provided that Plaintiff could never kneel (Tr. 21-22). As such, Plaintiff's Step Five argument lacks merit.

### IV.   CONCLUSION

Because substantial evidence supports the Administrative Law Judge's ("ALJ") decision, this Magistrate Judge **RECOMMENDS** that Plaintiff's motion for summary judgment be **DENIED**, Defendant's motion for summary judgment be **GRANTED**, and the Commissioner's findings be **AFFIRMED**.

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *See Thomas v. Arn*, 474 U.S. 140

---

unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in a most skeletal way, leaving the court to . . . put flesh on its bones.").

(1985); *Howard v. Sec'y of HHS*, 932 F.2d 505, 508 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947, 949-50 (6th Cir. 1981). The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *See Willis v. Sec'y of HHS*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be no more than 20 pages in length unless, by motion and order, the page limit is extended by the court. The response shall address each issue contained within the objections specifically and in the same order raised.

s/Mark A. Randon
Mark A. Randon
United States Magistrate Judge

Dated:  December 30, 2013

Certificate of Service

*I hereby certify that a copy of the foregoing document was mailed to the parties of record on this date, December 30, 2013, by electronic and/or ordinary mail.*

*s/Felicia Moses for Eddrey Butts*
*Case Manager for Magistrate Judge Mark A. Randon*